STATE OF NORTH CAROLINA v. WILLIAMS AND HESSEE, A LIMITED PARTNERSHIP; IRVIN P. BREEDLOVE, JR., TRUSTEE; CLAUDE B. WILLIAMS, JR., AND WIFE, JERRY W. WILLIAMS

No. 8015SC1178

(Filed 15 September 1981)

1. **Eminent Domain § 3.4— expansion of State Park—State's right to acquire property**

    The State has the right to condemn property to expand a State Park in order to protect a historic "swimming hole" and to assure the public of continued access to the site. G.S. 146-22.1(5), (6) and (8).

2. **Eminent Domain § 7.7— failure of State to file Environmental Impact Statement or negative declaration—defendants' waiver of right to object**

    The State was not required to file an Environmental Impact Statement in order to condemn property to expand a State Park, but the State should have filed a negative declaration pursuant to Section 25.0105 of the North Carolina Administrative Code. The requirement to file such a declaration, however, may be waived by the failure of the landowner party in a condemnation proceeding to assert a violation of the Environmental Policy Act, or rules and regulations adopted pursuant thereto, as a defense in his responsive pleading as required by G.S. 1A-1, Rule 12(b).

3. **Eminent Domain § 3— acquisition of land for public purpose—failure to show arbitrary and capricious**

    Appellants' claim that the State acted arbitrarily and capriciously in condemning their land was meritless where the evidence showed acquisition of appellants' land was for a proper public purpose and the State complied with procedural requirements for condemnation. Neither did evidence that the State originally negotiated to acquire a smaller tract than it actually condemned and that the State had previously been financially unable to purchase the land from the former owner require a finding that the acquisition of appellants' property was arbitrary and capricious.

APPEAL by defendants from *Bailey, Judge.* Judgment entered 15 August 1980 in Superior Court, ORANGE County. Heard in the Court of Appeals 27 May 1981.

On 11 February 1980, the State of North Carolina instituted condemnation proceedings against defendants Williams and Hessee, a limited partnership; Irvin P. Breedlove, Jr., Trustee; Claude B. Williams, Jr., and his wife. The State sought to condemn 11.95 acres more or less, in which defendants held an interest, for the purpose of expanding the Eno River State Park. The events leading up to the State's action are as follows: In November 1979 the North Carolina Department of Natural Resources and Community Development recommended that the land at issue be acquired through condemnation, if necessary. The Department indicated that the purpose of the acquisition was "[t]o complete state ownership of the Cole Mill Access Area, Eno River State Park, providing protection and public access to an area known as the Bobbit's (sic) Hole." In a Department memorandum it was emphasized that the master plan for the Park proposed a horse trail on the land at issue and that the State wished to protect and assure continued access to Bobbitt Hole, an historic swimming hole located on the property. Defendants had offered to sell the State an easement to the property, but said offer was found to be unfeasible for specified reasons. The Department of Natural Resources and Community Development then requested the Department of Administration to acquire said property. After investigating all aspects of the proposed acquisition, the Department of Administration found it to be in the best interest of the State and necessary for inclusion in the Eno River State Park. After unsuccessfully negotiating with defendants to purchase the property, the Department of Administration recommended that the Governor and Council of State authorize acquisition of the property by condemnation. On 5 February 1980 the Governor and Council of State approved this recommendation, and condemnation proceedings were promptly filed.

In their answer defendants denied the authority of the State to condemn their land and alleged that the taking of the property was neither urgently needed nor within the best interest of the State. Defendants then alleged nine defenses to the condemnation. First, defendant alleged that the condemnation was not for a public purpose and was instead arbitrary and capricious. They

based this defense upon contentions that the land was taken sole-ly to construct a horse trail, and that the taking was not author-ized by statute thus constituting a deprivation of defendants' property without due process of law. As their second defense, de-fendants alleged that the State was estopped from taking the property since it had refused an offer to sell by the former owners of the property. Third, defendants alleged that the State ultimately took more property than it originally informed defend-ants it would take. Fourth, and fifth, defendants alleged that the State was unlawfully attempting to take defendant Williams' easement to his home consisting of a driveway constructed on property owned by the defendant partnership. Sixth, defendants alleged that the State had attempted to defraud defendants in their offer to purchase the property. Seventh, defendants alleged that they would be irreparably harmed if a temporary restraining order were not issued. Eighth, defendants alleged that they should be compensated for the remainder of their property which would be damaged by the taking. Defendants finally alleged that a preliminary injunction should be issued pending adjudication of the merits.

On 12 August 1980 the matter was heard before Judge James H. Pou Bailey, sitting without a jury, to determine all issues other than just compensation. After considering testimony of witnesses for both sides, the pleadings and exhibits, the court decided in the State's favor. Judge Bailey specifically concluded that the State had the power to condemn the land at issue, that said condemna-tion was for a public purpose, that the State met all the statutory procedural requirements for condemnation, that the question of whether the taking was excessive is a legislative rather than a judicial issue, that defendants have not established that the ac-tion of the State was arbitrary or capricious, that the filing of an Environmental Impact Statement is not a prerequisite to the ac-quisition of land by condemnation, and that the State acquired fee simple title to the land at issue by filing the complaint, declara-tion of taking and notice of deposition and by depositing into the court a sum estimated to be just compensation.

From this order defendants appeal.

*Attorney General Edmisten, by Assistant Attorney General Roy A. Giles, Jr., and Special Deputy Attorney General T. Buie Costen, for the State.*

*Eugene C. Brooks, III, for defendant appellants.*

CLARK, Judge.

[1]  Defendants first argue that the State did not have the right to acquire their property for the purpose as set forth in the complaint. The exhibits attached to the complaint indicated that the purpose for taking the property was the "Expansion of Eno River State Park." Defendants specifically argue that a strict interpretation of G.S. 146-22.1(5), which provides for the condemnation of "[l]ands necessary for public parks and forestry purposes," does not authorize the use of the power of eminent domain for the "expansion" of the Park. Defendants point out that unlike subsection (5), other subsections of G.S. 146-22.1 specifically authorize the acquisition of land for the "expansion" of State facilities. They then cite *State v. Club Properties*, 275 N.C. 328, 167 S.E. 2d 385 (1969), as support for their argument. We find this case to be clearly distinguishable. Therein the North Carolina Supreme Court held that the Department of Administration did not have the legislative authority to condemn land for the purpose of conveying the land to the United States Government for a federal park. The Court emphasized that the right to exercise the power of eminent domain must be conferred by statute, either in express words or by necessary implication. The necessary implication of the language in G.S. 146-22.1(5) allows for the condemnation of the land involved in the case on appeal, particularly when this land had been included within the original master plan of the Park. We further emphasize that State witnesses presented evidence of other purposes of the condemnation. These were to place a horse trail along the top of the bluff overlooking the river in this area, to protect the historic "swimming hole" known as Bobbitt Hole and to assure the public of continued access to the site. G.S. 146-22.1(6) and (8) authorize condemnation of lands for these specified purposes. For example subsection (6) authorizes condemnation of "[l]ands involving historical sites, together with such adjacent lands as may be necessary for their preservation, maintenance and operation." Subsection (8) authorizes condemna-

tion of "[l]ands necessary to provide public access to the waters within the State."

[2]  Defendants next argue that the State had no authority to condemn the lands at issue without first filing an Environmental Impact Statement (EIS) as required by G.S. 113A-4. This statute in pertinent part provides:

> "(2) Any State agency shall include in every recommendation or report on proposals for legislation and actions involving expenditure of public moneys for projects and programs significantly affecting the quality of the environment of this State, a detailed statement by the responsible official setting forth the following:
>
> a. The environmental impact of the proposed action;
>
> b. Any significant adverse environmental effects which cannot be avoided should the proposal be implemented;
>
> c. Mitigation measures proposed to minimize the impact;
>
> d. Alternatives to the proposed action;
>
> e. The relationship between the short-term uses of the environment involved in the proposed action and the maintenance and enhancement of long-term productivity; and
>
> f. Any irreversible and irretrievable environmental changes which would be involved in the proposed action should it be implemented."

Judge Bailey, in his order, concluded that the "filing of an Environmental Impact Study is not a prerequisite to the acquisition of land by condemnation." He emphasized that a mere change in ownership of land would have no impact on the property. We agree that the State was not required to file an EIS, but base our decision on other reasoning. Specifically, defendants, in their answer, failed to allege any adverse environmental impact that the condemnation of their land might have. In fact defendants did not even allege the State's failure to file an EIS. In *Lewis v.*

*White,* 287 N.C. 625, 216 S.E. 2d 134 (1975), citizens and taxpayers of the State filed a complaint seeking to enjoin the Art Museum Building Commission and others from constructing an art museum at the Polk Prison site in Wake County. Plaintiffs alleged *inter alia* that the Commission had failed to comply with the Environmental Policy Act by filing an EIS as required by that Act. The Court upheld the trial court's dismissal of this claim and noted:

> "Nothing in this Act makes the filing of such statement a condition precedent to the commencement of construction of a building for which State funds have been appropriated. Furthermore, the complaint does not purport to state any respect in which the construction of an art museum at the present site of the Polk Prison could adversely affect the environment of the State or its natural beauty or the beneficial use of its natural resources. It is perfectly obvious that, nothing else appearing, the substitution of an art museum for a prison will not adversely affect the environment.

> In the absence of any allegation in the complaint as to how such proposed substitution could adversely affect 'the quality of the environment of the State,' we find no error in the conclusion and order of the Superior Court dismissing Claim No. 9."

287 N.C. at 639-40, 216 S.E. 2d at 143-44.

In the case *sub judice,* the condemnation of defendants' land for the Eno River State Park was "[t]o complete state ownership of the Cole Mill Access Area, Eno River State Park, providing protection and public access to an area known as the Bobbit's (sic) Hole." At trial further evidence tended to show that Bobbitt Hole was an historical site, that the land to be condemned was situated between lands already owned by the State and incorporated in the Park and that the acquisition of defendants' land was necessary in order to have contiguous hiking and horse trails in the Park. We feel that these purposes are clearly consistent with the declaration of the Environmental Policy Act as defined in G.S. 113A-3. This statute provides:

> "The General Assembly of North Carolina, recognizing the profound influence of man's activity on the natural en-

vironment, and desiring, in its role as trustee for future generations, to assure that an environment of high quality will be maintained for the health and well-being of all, declares that it shall be the continuing policy of the State of North Carolina to conserve and protect its natural resources and to create and maintain conditions under which man and nature can exist in productive harmony. Further, it shall be the policy of the State to seek, for all of its citizens, safe, healthful, productive and aesthetically pleasing surroundings; to attain the widest range of beneficial uses of the environment without degradation, risk to health or safety; and to preserve the important historic and cultural elements of our common inheritance."

We note, however, that *Lewis v. White, supra,* was decided prior to the enactment of the environmental regulations which were promulgated by the North Carolina Department of Administration. These regulations can be found in Title 1, Chapter 25 of the North Carolina Administrative Code. Pursuant to Section 25.0105, any property which "significantly" affects the environment requires the filing of an EIS with certain exceptions. The first of these exceptions provides:

"(1) When the proposed project will clearly have no significant impact upon the environment or if the benefits to be accrued from the proposed project clearly outweigh any adverse environmental effect; In such cases a negative declaration should be filed pursuant to provisions of 1 NCAC 25.0202; . . ."

Though this Code provision requires the filing of a negative declaration when the State agency determines that an Environmental Impact Statement is not required by G.S. 113A-4, the requirement may be waived by the failure of the landowner party in a condemnation proceeding to raise the environmental issue. In their answer the defendants made a general denial to the allegations in the complaint and alleged several other defenses, none of which raised the environmental issue. We know of no reason why a landowner party in a condemnation proceeding should not be required to assert a violation of the Environmental Policy Act, or rules and regulations adopted pursuant thereto, as a defense in his responsive pleading as required by G.S. 1A-1, Rule 12(b). The

failure of the defendants to assert in their answer this defense or to otherwise raise the issue before hearing constituted a waiver.

[3] In defendant's final argument, they contend that the acquisition of their property was carried out in an arbitrary and capricious manner. This argument appears to be based upon several beliefs including the following: that the land was not condemned for a public purpose, that the State failed to comply with the procedural requirements for condemnation, that the State originally negotiated to acquire a smaller tract than the one ultimately condemned and that the earlier refusal to buy the land at issue from the previous owner estopped the State from acquiring the land from defendants. The evidence presented to the trial court refutes each of these beliefs.

Defendants' first contention that their property was not condemned for a public purpose appears to be based upon the assumption that the property was to be condemned only for a horse trail. Defendants argue that such a purpose "can be utilized by only a small and select group of citizens." Instead Judge Bailey found and the evidence showed the following:

"5. The purpose of the State in attempting to acquire the land in question was for inclusion in the Eno River State Park. The acquisition of this tract will complete State ownership on the north bank of the Eno River from Willett Road in Orange County to Cole Mill Road in Durham County. The tract in question constituted an in-holding between two State-owned tracts within the Eno River State Park. Proposed Park uses in this area include: family and group picnicking areas, canoe launch and landing, river crossings, family wilderness area, and hiking and bridle trails.

6. The approved master plan for the park calls for the establishment of an equestrian trail and a nature trail on the subject property. An informal swimming area will also be established in conjunction with the 'Bobbitt Hole', which is a historically popular swimming hole bordering the property. Acquisition of the property will provide scenic protection for this unique feature of the river as well as providing environmental protection for the fragile floodplain portion of the subject property. The acquisition will also insure public access to the 'Bobbitt Hole' and a traditional hiking trail

located on the property. The subject tract is an integral part of the Cole Mill access area within the park."

We further emphasize that condemnation of land for the purpose of a public park has been held to be for a proper public purpose. *See State v. Club Properties, supra.*

The allegation that the State failed to comply with the procedural requirements for condemnation is also groundless. The State presented evidence that an application for acquisition of this land was filed with the Department of Administration, that the application was investigated, that a determination was made to the effect that the acquisition was in the State's best interest, that negotiation proceedings were then begun and that after no purchase price could be agreed upon condemnation of the land was approved by the Governor and Council of State. This conduct by the State was in compliance with G.S. 146-22 *et seq.*, concerning acquisitions of State lands. The condemnation proceedings, which were instituted after negotiations failed, complied with the requirements of G.S. 136-103 *et seq.*, concerning condemnation procedures of the Department of Transportation.

Defendants' next contention that the State originally negotiated to acquire a smaller tract than that actually condemned is correct, but does not constitute an arbitrary and capricious undertaking by the State. The evidence tended to show that the State first approached the partnership about purchasing a portion of their land, *estimated* to contain 10.90 acres, in April 1979. The owners indicated that they were not interested in selling. Williams stated that "the Eno River would run red with blood before the State would get the property." Subsequent to this meeting the property was appraised. During this time 5.43 acres of the land desired by the State was conveyed to Williams and his wife, individually. On 1 August 1979 the State made an offer to the partnership of $3,650 per acre with the exact acreage to be determined by a survey. This offer was refused. Thereafter on 25 January 1980, the State again made an offer to purchase that portion of the partnership's land previously sought, excluding the 5.43 acres conveyed to Williams and his wife, plus an additional portion of the partnership's property. This additional portion was to compensate for the acres conveyed to Williams. The State indicated that it altered the specific area to be condemned, so that

only the partnership's property would be affected. This final offer, which indicated that the acreage was to be determined by survey and that the estimated acreage was 11.95 acres, was also rejected. On 11 February 1980 the State initiated the condemnation proceedings indicating that the property to be condemned contained 11.95 acres more or less. This land actually contained 12.0136 acres. We fail to see how the condemnation of property first estimated to contain 10.90 acres, later estimated to contain 11.95 acres and finally determined to contain 12.0136 acres could constitute an arbitrary and capricious taking. The North Carolina Supreme Court has emphasized that in ordinary condemnation proceedings, " 'the question of necessity and of the proper extent of a taking is legislative and is subject to determination by such agency and in such way as the State may delegate.' [Citations omitted.]" *Highway Comm. v. Equipment Co.*, 281 N.C. 459, 470, 189 S.E. 2d 272, 278 (1972).

Finally, defendants argue that the State is estopped from condemning this land, since the State had earlier refused to purchase the land when it was offered for sale by the former owner, Bruce Jennette. Jennette and his wife conveyed the property to the partnership on 10 July 1978. Jennette's testimony indicates that prior to this conveyance, agents of the State informed him that the State did not have the money to buy the land but would be interested in acquiring the same in the future. This conduct by the State clearly does not estop the State from later acquiring the property at issue from the partnership. The State neither intentionally nor through culpable negligence induced defendants to buy the land when it earlier failed to purchase the land from Jennette because of financial inability. See *Webber v. Webber*, 32 N.C. App. 572, 232 S.E. 2d 865 (1977).

Other reasons allegedly supporting defendant's argument that the State acted arbitrarily and capriciously in condemning the land at issue have been considered by this Court and have been determined to be meritless.

Affirmed.

Judges MARTIN (Robert M.) and HILL concur.